IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEONA RENNA HOOPER,                    CIVIL NO. 1:04CV0014

             Plaintiff,

      V.

STATE OF NORTH CAROLINA; NORTH
CAROLINA CENTRAL UNIVERSITY;
NORTH CAROLINA CENTRAL
UNIVERSITY CAMPUS POLICE; JAMES
H. AMMONS, NCCU Chancellor in his
official capacity; CHIEF MCDONALD
VICK, Chief of Police in his individual
and official capacity; CAPTAIN VICTOR
O. INGRAM, in his individual and
official capacity; LIEUTENANT
MICHAEL WATLINGTON, in his
individual and official capacity


MEMORANDUM OPINION

TILLEY, Chief Judge.

       This matter is now before the Court on the Defendant North Carolina Central

University's[1] Motion for Summary Judgment [Doc. # 77]; Chancellor James H.

Ammons' Motion for Summary Judgment [Doc. # 76]; Chief McDonald Vick's

Motion for Summary Judgment [Doc. # 77]; Captain Victor O. Ingram's Motion for

Summary Judgment [Doc. # 72]; and Lieutenant Michael Watlington's Motion for

_____

       [1]North Carolina Central University and the North Carolina Central University
Campus Police Department will be referred to collectively as NCCU.

1

Summary Judgment [Doc. # 74].

For the reasons set forth below, NCCU's Motion for Summary Judgment [Doc. #77] is GRANTED as to the federal claims; Chancellor Ammons' Motion for Summary Judgment [Doc. #76] is GRANTED as to the federal claims; Chief Vick's Motion for Summary Judgment [Doc. #77] is GRANTED as to the federal claims; Captain Ingram's Motion for Summary Judgment [Doc. #72] is GRANTED as to the federal claims; and Lieutenant Watlington's Motion for Summary Judgment [Doc. #74] is GRANTED as to the federal claims. The state law claims of the Second Amended Complaint are DISMISSED because the Court declines to exercise supplemental jurisdiction.

I.

Stated in the light most favorable to the plaintiff, the facts of the case are as follows.[2] In March 2001, Ms. Hooper received an employment letter notifying her that she had been hired as a probationary employee at NCCU and that she would be on probationary status for a period of one year. [Hooper Dep. at 88; Doc. #80, app. 2]. In October 2001, after only seven months at NCCU, Ms. Hooper's immediate supervisor at the time, Lieutenant Buie, informed Ms. Hooper that she had been transferred from probationary status to permanent status. [Doc. #80, app. 6].

_____

[2]Facts related to Ms. Hooper's state law claims for wiretapping and intentional infliction of emotional distress are not discussed.

2

Ms. Hooper has asserted that while she was employed at NCCU she was discriminated against on the basis of gender and was retaliated against for filing a sexual discrimination grievance. Ms. Hooper complains generally that female officers were disciplined more harshly than male officers for similar or less serious conduct. The parties' summary judgment papers focus primarily on three specific incidents that occurred during the time Ms. Hooper was employed at NCCU and that ultimately led to her termination: (1) the December 6, 2001 "tie incident"; (2) the January 12, 2002 automobile accident involving Ms. Hooper's patrol car; and (3) the January 19, 2002 cafeteria incident.

A.

Police officers at NCCU are assigned to one of four squads. Each squad typically consists of a few officers, a lieutenant supervisor, and a civilian communications employee/dispatcher. At the time Ms. Hooper worked at NCCU, some squads did not have dispatchers. Officers assigned to those squads were responsible for completing the dispatcher duties.

When Ms. Hooper began working at NCCU, she was assigned to Lieutenant Buie's squad, which did not have a civilian dispatcher. [Hooper Dep. at 103]. As a result, while Ms. Hooper was assigned to Lieutenant Buie's squad, she was occasionally required to work in Communications as a dispatcher. Lieutenant Buie did not assign particular officers to work as dispatchers; rather, the officers would "work it out amongst" themselves each shift. [Hooper Dep. at 107]. Ms. Hooper

3

did not like to work in Communications as a dispatcher. [Hooper Dep. at 117].

On December 6, 2001, while Ms. Hooper was working in Communications as a dispatcher, she was not wearing the tie that was a required part of her uniform. Officer Anderson, who had been placed in charge of the shift in the absence of the supervising lieutenant, instructed Ms. Hooper to put on her tie. [Hooper Dep. at 432]. Ms. Hooper did not put on her tie. Ms. Hooper acknowledges that she has not seen other officers working in dispatch without wearing a tie. [Hooper Dep. at 432]. Officer Anderson reported the incident to Captain Ingram. At the shift change briefing, Captain Ingram approached Ms. Hooper to discuss her refusal to comply with Officer Anderson's instruction. [Hooper Dep. at 440]. Ms. Hooper refused to discuss the incident with Captain Ingram at that time. [Hooper Dep. at 440].

On December 11, 2001, Captain Ingram issued Ms. Hooper a written warning for unacceptable personal conduct for failure to put on her tie after being instructed to do so. [Doc. #80, app. 8]. The written warning letter informed Ms. Hooper that she had 15 days to appeal the written warning by filing a grievance. [Doc. #80, app. 8]. On December 29, 2001, Ms. Hooper filed a grievance with NCCU Human Resources alleging unfair disciplinary procedures between female officers and male officers.

After filing the grievance, Ms. Hooper was informed that she was not eligible to file a grievance because she was not a permanent employee. Ms. Hooper was

4

further informed that she had "accidently" or "mistakenly" been told in October 2001 that she was transferred from probationary to permanent status, and that she actually remained on probationary status. Probationary employees could not file grievances. Ms. Hooper believes that she was demoted from permanent status to probationary status as a result of her complaint that male officers and female officers were disciplined differently.

Because Ms. Hooper was not eligible to file a grievance, the grievance she attempted to file was removed from her personnel file. Ms. Hooper claims that her discrimination complaint was not forwarded to the Equal Employment Officer ("EEO") in violation of the NCCU sexual discrimination policy requiring Human Resources to forward all claims of discrimination to the EEO office. [Doc. #82 at 3]. Because probationary employees cannot be disciplined with a written warning, the warning Ms. Hooper received on December 11, 2001 was retracted. [Buie Dep. Ex. 17].

On January 1, 2002, Ms. Hooper was transferred to Lieutenant Watlington's squad from Lieutenant Buie's squad. Ms. Hooper believes there was a practice in the NCCU Police Department that female officers who made complaints of discrimination were transferred *to* Lieutenant Buie's squad. [Doc. #82 at 3]. Because Lieutenant Watlington's squad had a dispatcher, Ms. Hooper was no longer required to work in that capacity.

B.

On January 12, 2002, at 12:49 a.m., Ms. Hooper was driving her patrol car to respond to a call when she struck a guardrail on campus. [Doc. #81, app. 18]. Ms. Hooper stopped the patrol car to investigate the damage, and upon determining that the car sustained only minor paint damage, she continued to the call. [Hooper Dep. at 522]. Once the call was cleared, Ms. Hooper contacted Lieutenant Watlington to report the accident. [Hooper Dep. at 524]. Ms. Hooper then asked one of the Durham police officers who had also responded to the call to complete an automobile accident report. [Hooper Dep. at 524].

In addition to the Durham police report, Lieutenant Watlington submitted an NCCU police report regarding Ms. Hooper's accident. [Doc. # 81, app. 21]. Lieutenant Watlington's report stated that Officer Hooper contacted him at 1:05 a.m. and informed him that she had struck a guardrail resulting in minor paint damage to her patrol vehicle. [Doc. #81, app. 21]. Approximately three weeks later, on February 5, 2002, Lieutenant Watlington submitted another report regarding the accident that occurred on January 12, 2002. [Doc. #81, app. 23]. This supplemental report appears to contradict the initial report that Lieutenant Watlington filed shortly after the accident. [Doc. #81, app. 23]. For example, while the first report states that Ms. Hooper reported the accident to Lieutenant Watlington at 1:05 a.m., the second report suggests that Lieutenant Watlington "discovered" the accident at 12:59 a.m. while he was on patrol and that Ms.

6

Hooper contacted him by radio upon seeing his patrol car. [Doc. #81, app. 23].

Lieutenant Watlington's first report was removed from police records and the report

number associated with that report was reassigned in the police logs. [Buie at 144-

151; Doc. #81, app. 22].

C.

On January 19, 2002, Ms. Hooper made plans to meet a fellow officer at the

NCCU cafeteria for breakfast during her shift. [Hooper Dep. at 634-37]. Ms.

Hooper was aware that officers had been told not to eat at the same time while

they were on duty. [Hooper Dep. at 635-36]. When Ms. Hooper entered the

cafeteria, a cafeteria worker approached her and sought assistance with a student

who was refusing to pay for his food. [Hooper Dep. at 638]. Ms. Hooper

approached the student and asked whether he had paid for his food. [Hooper Dep.

at 638]. The student became belligerent and refused to respond to Ms. Hooper's

questioning. [Hooper Dep. at 643]. Ms. Hooper was intimidated and scared by the

student, [Hooper Dep. at 653], and she radioed for backup. [Hooper Dep. at 654-

55]. Ms. Hooper asked Lieutenant Watlington to come to the cafeteria and to bring

a Campus Appearance Ticket ("CAT"). [Hooper Dep. at 679].

While Ms. Hooper was waiting for Lieutenant Watlington to arrive, she

radioed NCCU police Communications to obtain information about the student in the

cafeteria. [Hooper Dep. at 687]. The individual with whom Ms. Hooper spoke at

Communications could not confirm that there was a student at NCCU with the

7

name the student in the cafeteria had provided to Ms. Hooper. [Hooper Dep. at 687]. It appears that the student's first and last name may have been inverted on his student ID, which prevented confirmation of his identity as an NCCU student. [Hooper Dep. at 687-93.

Lieutenant Watlington arrived in the cafeteria while Ms. Hooper was on the radio with Communications. [Hooper Dep. at 693]. After handing Ms. Hooper the CAT form she had requested, Lieutenant Watlington spoke to the student. [Hooper Dep. at 693]. To Ms. Hooper, it appeared that Lieutenant Watlington and the student were friends. Ms. Hooper approached the student in order to confirm his identity for purposes of completing the CAT form. [Hooper Dep. at 695]. As Ms. Hooper approached the student, he became angry and aggressive. [Hooper Dep. at 695]. The student began yelling at Ms. Hooper, and Lieutenant Watlington did not intervene. [Hooper Dep. at 696-97]. When Ms. Hooper attempted to speak to the student, Lieutenant Watlington yelled at her to be quiet. [Hooper Dep. at 696-97]. At this point, Ms. Hooper handed the incomplete CAT form to Lieutenant Watlington for him to complete and went to get something to eat. [Hooper Dep. at 698].

Later that morning, Ms. Hooper contacted Lieutenant Watlington by radio to set up a meeting to discuss the cafeteria incident. [Hooper Dep. at 707]. Lieutenant Watlington would not discuss the incident at that time and told Ms. Hooper "to wait." [Hooper Dep. at 708]. Ms. Hooper waited approximately 20

minutes and then proceeded to headquarters in order to meet with Lieutenant Watlington. [Hooper Dep. at 709].  Upon arrival at headquarters, Ms. Hooper saw Lieutenant Watlington shaking hands with the student who had been involved in the cafeteria incident. [Hooper Dep. at 710].

After the student left headquarters, Ms. Hooper approached Lieutenant Watlington, told him that she did not feel safe working with him, and asked to speak to one of the captains. [Hooper Dep. at 711].  Lieutenant Watlington told Ms. Hooper that she could not speak with one of the captains. [Hooper Dep. at 711]. Ms. Hooper returned to her patrol car, called Communications, and asked to speak with one of the captains. [Hooper Dep. at 712].  The dispatcher told Ms. Hooper that Lieutenant Watlington had instructed him not to contact any captains for Ms. Hooper. [Hooper Dep. at 713].

Ms. Hooper knew that Captain Ingram would be working at an NCCU basketball game that evening. [Hooper Dep. at 714].  Ms. Hooper approached Captain Ingram at the basketball game and told him that she did not feel safe working with Lieutenant Watlington. [Hooper Dep. at 720-21].[  Captain Ingram told Ms. Hooper that he could not discuss the incident at that time and would meet with her on the next business day. [Hooper Dep. at 720-21].

After she left the gym, Ms. Hooper completed a "Statement Form" in which she stated that she did "not feel safe under [her] current supervisor and [her] current work conditions." [Doc. #81, app. 26].  Ms. Hooper's concerns about

9

Case 1:04-cv-00014-NCT   Document 110   Filed 10/03/06   Page 9 of 42

safety under Lieutenant Watlington's command were not limited to this incident in the cafeteria. On previous occasions, Ms. Hooper had attempted to reach Lieutenant Watlington for backup while she was on patrol and had not been able to contact him. [Hooper Dep. at 729]. Ms. Hooper agrees that her inability to contact Lieutenant Watlington at times was not a problem limited to her attempts but that male officers also frequently had trouble contacting Lieutenant Watlington at times. [Hooper Dep. at 5-04, 514]. In the "Statement Form," Ms. Hooper requested to speak with legal counsel prior to submitting an official statement and also requested administrative leave with pay pending an investigation. [Doc. #81, app. 26].

The next morning, Ms. Hooper reported to NCCU for her assigned shift. [Hooper Dep. at 762]. She spent most of her shift in her patrol car in a parking lot preparing a report of the cafeteria incident the previous day. [Hooper Dep. at 768-70]. Ms. Hooper does not know whether the parking lot in which she prepared the report was on the part of campus she was assigned to patrol that day. [Hooper Dep. at 769-71]. When Ms. Hooper went to headquarters to make copies of her report, she saw Lieutenant Watlington making copies of witness statements related to the cafeteria incident. [Hooper Dep. at 777-78]. Lieutenant Watlington had not provided copies of these witness statements to Ms. Hooper prior to the preparation of her report. [Hooper Dep. at 777-78].

Before drafting her report, Ms. Hooper asked the Communications worker to do a background check on the student involved in the cafeteria incident. The

10

background check revealed that the student had several prior arrests, including assault against police officers. [Hooper Dep. at 764]. Ms. Hooper then prepared two criminal citations for the student, one for disorderly conduct and one for providing false information. [Hooper Dep. at 780]. In the fall of 2001, Ms. Hooper had been informed that NCCU students should be treated differently than non-students when it came to the issuance of criminal citations. [Hooper Dep. at 613; Ammons Dep. Ex. 3]. In particular, Ms. Hooper had been instructed that although there was no formal policy or procedure, NCCU had a practice of not charging NCCU students with criminal citations. [Hooper Dep. at 233; Ammons Dep. Ex. 3]. Rather, students were dealt with on campus through the issuance of a CAT.

At the end of her shift on January 20, 2002, Ms. Hooper handed the criminal citations she had prepared to a Durham police officer for delivery to the magistrate's office. [Hooper Dep. at 820]. Ms. Hooper then gave the "pink copies" of those citations, which were to be served on the student, to Officer Williams for service on the student during the next shift. [Hooper Dep. at 796-97; Ammons Dep. Ex. 3]. Ms. Hooper also handed her completed report, including copies of the criminal citations, to Lieutenant Watlington. [Hooper Dep. at 781]. Ms. Hooper believes this report was removed from NCCU Police Department files by reassigning the report number to another incident. [Doc. #82 at 6].

Once her shift ended, Ms. Hooper remained on campus and rode along with Officer Osborne, another campus police officer. [Hooper Dep. at 795]. During this

11

ride along, Ms. Hooper heard Lieutenant Watlington call over the radio and order Officer Williams not to serve the pink copies of the citations. [Hooper Dep. at 809; Ammons Dep. Ex. 3]. Ms. Hooper responded over the radio and told Lieutenant Watlington that she needed the pink copies to be served. [Hooper Dep. at 810]. Lieutenant Watlington twice told Ms. Hooper to bring the original citations to headquarters. [Hooper Dep. at 811, 879]. Ms. Hooper responded "1010," which means negative. [Hooper Dep. at 875].

Captain Ingram then came on the radio and ordered Ms. Hooper not to charge the student. [Hooper Dep. at 828]. Captain Ingram also instructed Ms. Hooper to deliver the original citations to Lieutenant Watlington. [Hooper Dep. at 811-12]. Ms. Hooper responded that if they were ordering her not to charge the student, she would need that order in writing. [Hooper Dep. at 813]. Ms. Hooper did not inform her supervising officers that she no longer possessed the original citations because those citations had already been turned over to the Durham Police Department. [Hooper Dep. at 824-25, 829]. Captain Ingram told Ms. Hooper to come to headquarters. [Hooper Dep. at 832].

Upon her arrival at headquarters, Captain Ingram again ordered Ms. Hooper not to charge the student. [Hooper Dep. at 832]. Ms. Hooper again told Captain Ingram that she would need such an order in writing. [Hooper Dep. at 833-34]. Captain Ingram instructed Lieutenant Watlington to take Ms. Hooper's badge and side arm. [Hooper Dep. at 834]. Ms. Hooper was placed on administrative leave

12

pending an internal investigation. [Hooper Dep. at 834; Doc. #81, app. 27].

At the conclusion of the internal investigation in February 2002, Ms. Hooper was terminated from employment with NCCU. [Vick Dep. Ex. 12].  According to Ms. Hooper's termination letter, she was terminated for unacceptable personal conduct; the letter specifically referenced  insubordination on January 19 and 20, 2002, the patrol car accident, and being out of uniform. [Vick Dep. Ex. 12]. Captain Vick notified the Criminal Justice Training and Standards Commission that Ms. Hooper's "probationary appointment was terminated for insubordination and leaving the scene of an accident after wrecking a police vehicle." [Doc. #81, 35].

Ms. Hooper appealed her termination to the NCCU Grievance Review Committee. [Doc. #81, app. 31].  Ms. Hooper believes that the grievance hearing was biased against her and that her superiors attempted to make it impossible for Officer Williams to testify on her behalf by assigning him to an off-campus training exercise that day. [Doc. #81, app. 25].  Despite the training assignment, Officer Williams testified on Ms. Hooper's behalf at the hearing.  [Doc. #81, app. 25].  By affidavit submitted in this matter, Officer Williams testified that he believed the supervising officers in the NCCU Police Department were out to get Ms. Hooper. [Doc. #81, app. 25].  Ultimately Chancellor Ammons upheld the finding of the grievance committee that Ms. Hooper's termination was not the result of discrimination or retaliation. [Doc. #81, app. 33].

Ms. Hooper appealed Chancellor Ammons' decision to the Civil Rights

Division of the North Carolina Office of Administrative Hearings ("OAH").  The OAH

contacted NCCU and requested the production of information regarding Ms.

Hooper's employment and termination from NCCU. [Doc. #80, app. 36].  NCCU did

not comply with this request. [Doc. #80, app. 36].  In its determination letter

regarding Ms. Hooper's complaint, the OAH noted that "[i]n years past, the [Civil

Rights Division] has noticed [NCCU] with charges of employment discrimination,

and has investigated [NCCU] for violations of Title VII and other federal laws.  This

is the first time [NCCU] has elected not to comply with the investigation."  [Doc.

#80, app. 36].

Ms. Hooper received a right-to-sue letter regarding her Title VII claim from the

Equal Employment Opportunity Commission on October 3, 2003.  On January 12,

2004, Ms. Hooper filed a Complaint in the Middle District of North Carolina against

the State of North Carolina, NCCU, the NCCU Police Department and the individual

defendants [Doc. #1].  Ms. Hooper filed an Amended Complaint as of right on June

3, 2004 [Doc. #13], which was dismissed without prejudice by this Court on

September 22, 2004, for failure to comply with Rule 8 of the Federal Rules of Civil

Procedure.  [Doc. #27].  Ms. Hooper was instructed to file an amended complaint

within 20 days of the dismissal, and on  October 12, 2004,  Ms. Hooper filed a

Second Amended Complaint seeking declaratory and injunctive relief, compensatory

damages, punitive damages, and attorneys' fees.  [Doc. #28].

Ms. Hooper's Second Amended Complaint asserts the following claims under

federal law: (1) gender discrimination and retaliation under Title VII[3] of the Civil Rights Act of 1964 as amended (42 U.S.C § 2000e et seq.); (2) a discrimination claim under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1682 et seq.); (3) claims pursuant to 42 U.S.C. § 1985 that the defendants conspired to discriminate and retaliate against her on the basis of gender; and (4) a 42 U.S.C. § 1983 claim that defendants acted with reckless disregard for her rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The Second Amended Complaint also asserts various state law claims including violations of the North Carolina Constitution, breach of contract, wrongful discharge, intentional and negligent infliction of emotional distress, and a claim for damages pursuant to the North Carolina Electronic Surveillance Act, N.C. Gen. Stat. § 15A-286 et seq.

On November 1, 2004, the Defendants filed a Motion to Dismiss most of the claims in the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In an opinion dated April 13, 2005, this Court granted in part and denied in part the Motion to Dismiss. [Doc. #33]. In particular, this Court dismissed (1) Ms. Hooper's claims for punitive damages; (2) all state law claims

---

[3]Ms. Hooper's Second Amended Complaint makes several references to a pattern of unlawful conduct and a pattern, practice, and policy of discrimination at the NCCU Campus Police Department. To the extent Ms. Hooper is attempting to assert a "pattern and practice" claim under Title VII, the Fourth Circuit has explained that there is no private, non-class cause of action for "pattern and practice" discrimination under Title VII in the Fourth Circuit. Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 760 (4th Cir.1998).

Case 1:04-cv-00014-NCT   Document 110   Filed 10/03/06   Page 15 of 42

against NCCU and the individual defendants sued in their official capacities due to Eleventh Amendment immunity; (3) all claims under the North Carolina State Constitution against NCCU and the individual defendants sued in their official capacities; (4) the wrongful discharge claim against the individual defendants in their individual capacities; and (5) the negligent infliction of emotional distress claim. In addition, this Court held that Ms. Hooper did not have a protected property interest in continued employment by the NCCU Campus Police Department because she was not a career state employee as defined by the North Carolina State Personnel Act.

Each of the defendants have filed Motions for Summary Judgment as to all remaining claims in the Second Amended Complaint.

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Cox, 249 F.3d at 299. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of

16

proof at trial.  <u>Celotex</u>, 477 U.S. at 322-23.   In essence, summary judgment

requires a determination of the sufficiency of the evidence, not a weighing of the

evidence, and the analysis concerns "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-52.

III.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to

discharge an employee or discriminate in "compensation, terms, conditions, or

privileges of employment" because of gender.  42 U.S.C. § 2000e-2(a).  In order to

prove a claim of gender discrimination under Title VII, a plaintiff may provide direct

evidence of discrimination, such as "conduct or statements that both reflect directly

the alleged discriminatory attitude and that bear directly on the contested

employment decision," or, in the absence of such direct evidence, the plaintiff may

proceed using circumstantial evidence under the burden-shifting proof scheme

established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792 (1973); <u>Taylor v. Virginia Union Univ.</u>,193 F.3d 219, 232 (4th Cir. 1999).

 Ms. Hooper acknowledges that there is "no direct evidence of sexual

discrimination" and that she must proceed under the <u>McDonnell Douglas</u> burden-

shifting proof scheme. [Doc. #80 at 9].  Under <u>McDonnell Douglas</u>, a plaintiff's

prima facie case of discrimination creates an inference that the employment action

was based on unlawful discrimination.  If the plaintiff can establish a prima facie

17

case, the employer must then give a legitimate, nondiscriminatory reason for its action in order to rebut that inference.   McDonnell Douglas, 411 U.S. at 802.  If the employer presents such a reason, the plaintiff can still prove discrimination by showing that the stated reason is a mere pretext for a decision motivated by discrimination.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); McDonnell Douglas, 411 U.S. at 804.  However, if a plaintiff fails to establish a prima facie case of discrimination or fails to raise a genuine factual dispute concerning the employer's legitimate and non-discriminatory explanation for the alleged discriminatory act, the defendant is entitled to summary judgment. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir.1995).

A.

The Fourth Circuit recognizes two types of prohibited sexual harassment or discrimination: "harassment that creates an offensive (hostile) work environment and harassment where sexual consideration is demanded in exchange for job benefits," which is referred to as *quid pro quo* harassment.  Spencer v. Gen. Elec. Co., 894 F.2d 651, 658 (4th Cir. 1990), overruled on other grounds by Farrar v. Hobby, 506 U.S. 103 (1992).   Ms. Hooper does not claim that she was subject to *quid pro quo* harassment.

In order to state a prima facie hostile work environment claim, the plaintiff must prove that the offending conduct: (1) was unwelcome; (2) was based on a protected status; (3) was sufficiently severe or pervasive to alter the conditions of

18

employment and to create an abusive working atmosphere; and (4) is imputable to the employer. See Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

The Supreme Court has stated that only harassment that is so "severe and pervasive" that it alters the conditions of employment and creates an abusive working environment will constitute a violation of Title VII. See Clark County School District v. Breeden, 532 U.S. 268, 270 (2001). In examining whether alleged harassment was sufficiently severe or pervasive, courts consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

In addition, the severe and pervasive test contains both subjective and objective elements. Subjectively, the plaintiff must perceive her environment to be hostile, and the allegedly discriminatory conduct must be objectively offensive so that a reasonable person would find the conduct hostile or abusive. Id. at 21-22.

In this case, Ms. Hooper proffers the following in support of her hostile work environment claim. First, Ms. Hooper claims that in October 2001, male officers refused to assist her and another female officer in responding to four simultaneous fire alarms on campus. Second, Ms. Hooper asserts that she complained to Captain Vick about the conduct of these male officers, and that, despite promising to

19

address the situation, he failed to impose any discipline. Third, Ms. Hooper asserts that female officers disproportionately worked as dispatchers in Communications in comparison to their male counterparts. Finally, Ms. Hooper claims that the defendants regularly made work assignments on the basis of gender and discriminated against female officers in making work assignments.

The fire alarm situation appears to be an isolated incident that did not recur on any other occasion. Ms. Hooper does not identify any similar incidents in which male officers refused to assist female officers. The Fourth Circuit has consistently held that infrequent or isolated incidents of inappropriate conduct are not severe or pervasive as a matter of law. Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir.1996) (listing cases). As such, the fire alarm incident cannot serve as the basis for a hostile work environment claim.

Ms. Hooper's claim that, as a female officer, she disproportionately worked as a dispatcher in Communications is defeated by Ms. Hooper's own testimony. In particular, Ms. Hooper testified that she was not assigned to work as a dispatcher by any of her superior officers. Rather, Ms. Hooper explained that on Lieutenant Buie's squad, the officers "worked it out amongst themselves" to ensure that Communications was staffed. Moreover, when Ms. Hooper was transferred to Lieutenant Watlington's squad, Ms. Hooper no longer worked as a dispatcher.

Finally, as to the claim that work assignments were based on gender, the only specific example cited by Ms. Hooper involves the assignment of female

20

officers to Communications duty.  [Hooper Dep. at 106-15].  As noted above, Ms.
Hooper's testimony defeats her claim that Communications shift assignments were
based on gender.

Ms. Hooper does not present any other evidence to support her generalized
claim that female officers were given less significant work assignment than their
male counterparts.  It is well established in the Fourth Circuit that conclusory,
nonspecific allegations of a hostile work environment will not survive a defendant's
summary judgment motion.  See Causey v. Balog, 162 F.3d 795, 801-02 (4th Cir.
1998) (concluding that summary judgment was appropriate on an ADEA claim
where the plaintiff provided no evidence that the defendants' conduct was
discriminatory).

Ms. Hooper has not presented sufficient evidence to support a prima facie
hostile work environment claim.  The defendants' Motions for Summary Judgment
on the hostile work environment claim under Title VII are GRANTED, and the claims
are DISMISSED.

B.

In addition, Ms. Hooper claims that she was terminated in violation of Title
VII because her termination was based on gender.  To establish a prima facie case
of discrimination in the context of discriminatory discharge, Ms. Hooper must show:
(1) she is a member of a protected class; (2) she suffered an adverse employment
action; (3) at the time of the adverse employment action, she was performing at a

21

level that met the employer's legitimate job expectations; and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." <u>E.E.O.C. v. Sears Roebuck & Co.</u>, 243 F.3d 846, 851 (4th Cir. 2001).

1.

Ms. Hooper has satisfied the first two elements of a claim for discriminatory discharge. First, Ms. Hooper has presented evidence that she is female. In addition, Ms. Hooper's termination constitutes an adverse employment action.

Ms. Hooper contends that she suffered two other adverse employment actions, specifically demotion from permanent employee status to probationary employee status and transfer to Lieutenant Watlington's squad. The Fourth Circuit has explained that "adverse employment actions" affect the terms, conditions, or benefits of employment. <u>Munday v. Waste Mgmt. of N. Am., Inc.</u>, 126 F.3d 239, 243 (4th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1116 (1998); <u>See Von Gunten v. Md.</u>, 243 F.3d 858, 866 (4th Cir. 2001) ("Adverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment.") (citation omitted).

Ms. Hooper was initially hired as a probationary employee and was told that she would be a probationary employee for a period of one year. After Ms. Hooper had been employed with NCCU for approximately seven months, Lieutenant Buie

22

informed her that she had been promoted from probationary to permanent status. When Ms. Hooper attempted to file a grievance in response to the written warning she received as a result of the tie incident, she was informed that she was not a permanent employee and thus not eligible to file a grievance.

Ms. Hooper claims that under the North Carolina State Personnel Act all state employees are eligible to become permanent employees after six months and that all such permanent employees are subject to a hierarchy of disciplinary actions ranging from written warnings to termination. [Doc. #80 at 1].

Vanessa Gregory, Assistant Human Resources Director for Employee Services and Benefits at North Carolina Central University, testified that "normal employees" at NCCU serve a six month probationary period, which can be extended for three months.  [Gregory Dep. at 14].  Police officers are governed by Criminal Justice Standards and Training Commission, which requires a one year probationary period.[4] [Gregory Dep. at 15-16].  Ms. Gregory testified that she was not aware of any NCCU police officers that had not served a one year probationary period.

In addition to discussing the six month and twelve month probationary periods, Ms. Gregory also testified that career state employees are individuals who

---

[4]Ms. Hooper acknowledges that the Criminal Justice Standards and Training Commission requires a twelve month probationary period for police officers, but asserts that this probationary period is separate and distinct from the six month probationary period that Ms. Hooper claims is required under the State Personnel Act. [Doc. #80, at 2; Doc. #81, app. 30 (expert report of Norman S. Beck, Private Investigator)].

23

have been "continuously employed with the state of North Carolina for more than two years." [Gregory Dep. at 18]. According to Ms. Gregory, career state employees are subject to four disciplinary actions ranging from written warnings to termination. Career state employees are able to file grievances to challenge these disciplinary actions. [Gregory Dep. at 23].

Ms. Hooper claims that the terms, conditions, and benefits of her employment were altered by the fact that as a probationary employee she was not eligible to file a grievance and that she would have been able to file a grievance as a permanent employee. Ms. Hooper's argument assumes that as a "permanent" employee she would have been able to file a grievance. However, according to Ms. Gregory's testimony, the ability to file a grievance in response to a written warning does not attach to "permanent" employees. Rather, Ms. Gregory's testimony is clear that the disciplinary actions and grievance procedures are applicable only to individuals who are career state employees, which requires continued employment with the state for a period of 24 months. [Gregory Dep. at 23; see N.C. Gen. Stat. § 126-1.1 (2005) (defining the term "career state employee" as requiring continuous employment with the state for 24 months)]. Ms. Hooper offers no evidence to contradict Ms. Gregory's testimony on this point, and it is undisputed that Ms. Hooper was not eligible to be a career state employee. In addition, there has been no showing that Lieutenant Buie was authorized to promote Ms. Hooper or anyone else from probationary to permanent status.

24

Assuming that Ms. Hooper was eligible to be promoted to permanent employee status within seven months of her initial employment, that she was in fact promoted to permanent status, and that she was demoted to probationary status, Ms. Hooper has not demonstrated that this demotion constitutes an adverse employment action. Ms. Hooper proffered only one condition of her employment that changed as a result of her alleged transfer from permanent status to probationary status – the ability to file a grievance in response to disciplinary action. Because Ms. Hooper was not employed with the state of North Carolina for a period of 24 months and thus would not have been able to file a grievance in December 2001 – regardless of her classification as either a probationary employee or a permanent employee – Ms. Hooper has not demonstrated that the alleged transfer to probationary status constituted an adverse employment action. In addition, the written warning about which she sought to complain – failing to follow the directive to put on her tie while acting as a dispatcher – was withdrawn for the reason that she was a probationary employee. Moreover, although Ms. Hooper was not eligible to file a grievance challenging the written warning associated with the tie incident, Ms. Hooper's employment status, whether probationary or permanent, had no bearing on Ms. Hooper's ability to file a gender discrimination complaint with the appropriate federal or state agencies. Thus, Ms. Hooper was able to pursue a gender discrimination claim against NCCU regardless of her employment status.

Similarly, with respect to the transfer to Lieutenant Watlington's squad, Ms.

25

Hooper has not presented any evidence that this transfer negatively affected the terms, conditions, or benefits of employment. To the contrary, Ms. Hooper presented evidence indicating that the conditions of her employment were *positively* impacted by her transfer to Lieutenant Watlington's squad. For instance, when Ms. Hooper was on Lieutenant Buie's squad, she worked occasionally as a dispatcher, a duty she did not like to perform. On Lieutenant Watlington's squad, however, Ms. Hooper was not required to serve as a dispatcher because Lieutenant Watlington's squad had a permanent dispatcher. [Hooper Dep. at 502]. In fact, Ms. Hooper testified that other than working with a new set of officers and not having to work as a dispatcher there was no difference between Lieutenant Watlington's squad and Lieutenant Buie's squad. [Hooper Dep. at 502].

### 2.

With respect to the third element of a discriminatory discharge claim, Ms. Hooper has not established that she was satisfactorily performing her job at the time of her termination. Ms. Hooper cites to the testimony of Lieutenant Buie as support for the proposition, that in his opinion, Ms. Hooper was a satisfactory police officer at the time she served on his squad. [Doc. #80 at 10]. However, the overwhelming and uncontested evidence demonstrates that shortly before her termination in February 2002: (1) Ms. Hooper was not wearing her tie and thus was

26

not in her full uniform on at least one occasion[5]; (2) when instructed by a supervising officer to put on her tie, Ms. Hooper failed to do so; (3) Ms. Hooper knew that officers were not allowed to eat together while they were on patrol, yet she made plans to meet Officer Williams at the cafeteria on January 19, 2002; (4) Ms. Hooper knew that NCCU students were treated differently than non-students and that NCCU students were not to be issued criminal citations, however, she issued two criminal citations for the student involved in the cafeteria incident; (5) on at least one occasion, Ms. Hooper did not patrol her assigned area of campus but sat in her patrol car in a parking lot for most of her shift; (6) Ms. Hooper was directly ordered twice by Lieutenant Watlington and twice by Captain Ingram to return the original citations to headquarters and/or not to serve the citations, but she refused to obey those orders; (7) Ms. Hooper never informed her supervising officers that she could not return the original citations because they had already been turned over to the magistrate's office. These incidents clearly demonstrate that Ms. Hooper was not performing her job duties in a satisfactory manner.

3.

In support of the final element of her discriminatory discharge claim, Ms.

_____

[5]Ms. Hooper testified that she was not wearing her tie while she was working as a dispatcher on December 6 and also testified that she refused to put it on when requested to do so by her supervising officer. The written warning letter associated with that incident indicates that Ms. Hooper also appeared at a call earlier that day without her tie. Ms. Hooper testified that she cannot dispute the events described in that letter. [Hooper Dep. at 410-33].

27

Hooper has produced the discipline files of several male NCCU officers and asserts that discriminatory intent with respect to her discharge can be inferred from the fact that these officers committed the same, or more severe misconduct, and were not terminated. The bulk of the misconduct contained in these discipline files generally involves administrative misconduct. For example, Captain Ingram was cited for failing to discipline officers on more than one occasion and failing to accomplish administrative tasks assigned to him by Chief Vick. [Doc. #80, app. 44]. In addition, other officers were cited for failing to report to work, failing to check in with a supervisor while on duty, sleeping in a patrol vehicle, etc. [Doc. #80, app. 45; app. 46; app. 48; app. 49].

Some of the incidents contained in these discipline files involve serious conduct such as accusations of sexual harassment, making false reports, and conduct unbecoming an officer. [Doc. 82, app. 47; app. 48]. For instance, the misconduct allegedly committed by Sergeant Fairley involved allegations of making a false report of kidnaping to the Greenville Police Department, associating with persons violating the law, participating in crimes of fraud in use of a federal credit card, and violations of the Law Enforcement Code of Ethics. [Doc. #82, app. 47]. It is not clear from the record whether the allegations against Sergeant Fairley were ever substantiated. The record indicates that Sergeant Fairely resigned five days after he was informed of the allegations against him. Ms. Hooper claims that Sergeant Fairley was "allowed to resign," and apparently believes she was

28

discriminated against because she was not afforded the same opportunity to resign rather than be terminated.  There is nothing in the record to suggest, however, that Ms. Hooper attempted to resign and that her resignation was refused.  Moreover, because Ms. Hooper believes she was justified in refusing the orders not to issue citations to the student from the cafeteria, it is unlikely that Ms. Hooper would have submitted a letter of resignation.

Only one of the incidents identified by Ms. Hooper involved an officer failing to follow a direct order of superior officers. [Doc. #82, app. 54].  In that situation, Lieutenant Watlington was ordered by Captain Ingram to work at a dance at NCCU. [Doc. #82, app. 54].  Lieutenant Watlington asked to be excused from the dance, his request was denied, and he left the dance anyway. [Doc. #82, app. 54]. Lieutenant Watlington received a written warning letter for this conduct. [Doc. #82, app. 54].

Lieutenant Watlington's failure to follow an order to supervise a student dance pales in comparison to Ms. Hooper's conduct on January 20, 2002.  Ms. Hooper had specifically been instructed not to issue criminal citations to NCCU students.  Ms. Hooper disregarded this instruction when she issued the two criminal citations.  Ms. Hooper refused to comply with the direct order of her supervising officers on at least four occasions that the original citations be returned to NCCU police headquarters. Moreover, Ms. Hooper concealed the fact that the criminal citations had already been given to the Durham Police Department for delivery to

the magistrate's office.

In addition, Ms. Hooper asserts, that when considered cumulatively, the misconduct committed by Lieutenant Watlington while he has been employed at NCCU creates an inference that Ms. Hooper's termination was discriminatory. As noted above, in April 2001, Lieutenant Watlington received a written warning for failing to work at an NCCU dance. The documents Ms. Hooper produced relating to Lieutenant Watlington also include three coaching and counseling letters in 2002 and 2003 for the following conduct: (1)failing to report to an assigned shift for security of a special event on campus;(2) concerns that Lieutenant Watlington was not responding to calls for assistance and reported late to work, notifying him that he was too friendly with female students because they called him by his first name, and reminding him that he needed to focus more on paper work and administrative duties; and (3) failing to submit a report regarding Greek activities on campus. In 2003, Lieutenant Watlington received a written warning for failing to report that he was alone on duty on campus.

Also in 2003, Lieutenant Watlington received a written warning for an incident involving a female NCCU student. In violation of NCCU policy, Lieutenant Watlington entered a female floor of a dormitory without escort of the resident advisor assigned to the floor. Lieutenant Watlington entered the dorm room of a female student, looked at one of her photo albums without her permission, and made an inappropriate comment to the student about her boyfriend. Lieutenant

30

Watlington received a written warning for this incident. [Doc. #82, app. 54].

Ms. Hooper asserts that Lieutenant Watlington's conduct over a period of three years was more serious than her conduct in December 2001 and January 2002 and that the fact Lieutenant Watlington was not terminated demonstrates that she was discriminated against when she was terminated for less serious conduct. Lieutenant Watlington's discipline file clearly demonstrates that he was cited and disciplined for unacceptable conduct. Lieutenant Watlington's discipline file also demonstrates that when he received a written warning for the incident involving the female student in June 2003, he had been employed at the NCCU Police Department for a period in excess of two years. Thus, it appears that Lieutenant Watlington would have achieved career state employee status. As a career state employee, Lieutenant Watlington was subject to state mandated disciplinary and termination procedures that were not applicable to Ms. Hooper, who was not a career state employee. [See Gregory Dep. at 18-22 (explaining the disciplinary procedures for career state employees.)]. As such, Ms. Hooper's reliance on the cumulative nature of Lieutenant Watlington's conduct is misplaced. While not minimizing the seriousness of that conduct which occurred over a period of time, it is different in kind from a series of refusals to obey direct orders of superior officers occurring over a short period.

In sum, although Ms. Hooper has established the first two elements of a discriminatory discharge claim, she has failed to present sufficient evidence that she

was performing at a level that met legitimate job expectations and that she was terminated under circumstances giving rise to an inference of unlawful discrimination. As such, Ms. Hooper's discriminatory discharge claim pursuant to Title VII is DISMISSED.

C.

Ms. Hooper also claims that she was retaliated against in violation of Title VII, which makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Traditionally, in order to establish a prima facie case of retaliation under Title VII, the Fourth Circuit has held that a plaintiff must prove "(1) that she engaged in a protected activity; (2) that an adverse employment action was taken against her; and (3) that there was a causal connection between the first two elements." Dowe v. Total Action Against Poverty, 145 F.3d 653, 656 (4th Cir.1998). Recently, the Supreme Court addressed a split in the circuits and explained that a Plaintiff need not show an "adverse employment action," as traditionally defined and applied in Title VII jurisprudence, in order to establish a prima facie retaliation case. See Burlington Northern and Santa Fe Ry. v. White, 126 S.Ct. 2405, 2415 (2006). Rather, the Court held that a retaliation plaintiff must show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a

32

reasonable worker from making or supporting a charge of discrimination." Id. (quotations omitted).

As with a discrimination claim, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. Id.

Ms. Hooper has satisfied the first two elements of a claim for retaliation. First, Ms. Hooper filed a grievance on December 29, 2001 with NCCU alleging that female officers were disciplined more harshly than male officers for similar conduct. Second, as discussed above, Ms. Hooper was terminated from NCCU on February 11, 2002. A reasonable employee would certainly find that termination is "materially adverse" to an employee.

As to the third element, the Fourth Circuit has held that "very little evidence of a causal connection is required to establish a prima facie case" and "merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a prima facie retaliation case. Tinsley v. First Union Nat. Bank, 155 F.3d 435, 443 (4th Cir. 1998); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989) (holding three month time period between protected activity and termination sufficient to

33

satisfy the causation element of the prima facie case of retaliation).  Ms. Hooper was terminated within several weeks of filing a grievance in which she alleged discrimination against female officers in the NCCU Police Department.  These facts are sufficient to establish a prima facie case of retaliatory discrimination in violation of Title VII.

Because Ms. Hooper has stated a prima facie claim for retaliation, it is necessary to consider the reasons NCCU stated for Ms. Hooper's termination and whether Ms. Hooper has presented evidence from which a reasonable person could conclude that those reasons were a pretext for retaliation.

In Ms. Hooper's termination letter, NCCU cited failure to report an accident and leaving the scene of an accident as being among the bases for Ms. Hooper's termination.  Ms. Hooper presented evidence that she was involved in a minor automobile accident in her police cruiser resulting in only superficial paint damage to the vehicle, that she contacted her supervising officer within approximately 10 minutes of the accident, and that she reported the accident to a Durham police officer for investigation.  It is suspicious that Lieutenant Watlington submitted an initial report indicating that Ms. Hooper contacted him to report the accident within 10 minutes of the accident and then submitted a second report suggesting that Ms. Hooper did not report the accident to him in a timely manner.  Ms. Hooper also presented evidence that other police officers were involved in accidents in their police cruisers and that those officers were not disciplined as a result of those

34

accidents. Although there may be insufficient evidence in the record to determine whether those officers failed to report their accidents to their supervising officers in a timely manner, the evidence in the record, particularly when considered in conjunction with Lieutenant Watlington's inconsistent reports, is sufficient to allow a reasonable person to conclude that the failure to report an accident and leaving the scene of an accident[6] is a pretext for retaliation.

As to the insubordination basis for her termination, however, Ms. Hooper has not presented sufficient evidence that this stated reason for her termination is a pretext for retaliation. To the contrary, Ms. Hooper has admitted that she failed to follow more than one direct order from superior officers. Ms. Hooper claims that she was justified in refusing the orders to return the original citations because she believes she had probable cause to issue the citations. [Doc. #80 at 18; Doc. #81, app. 30 (expert report of Norman S. Beck, Private Investigator)]. Ms. Hooper also claims that she was justified in asking for the order in writing because she would need such a writing to have the citations withdrawn from the Durham magistrate's office.

However, even assuming that Ms. Hooper's failure to follow direct orders was justified by the fact that Ms. Hooper had probable cause to issue the citations and assuming that Ms. Hooper was correct in her belief that she would need a

---

[6]The defendants have acknowledged that Ms. Hooper's conduct does not constitute leaving the scene of an accident under North Carolina law.

35

written order to void the citations, those facts do not accurately represent the situation that occurred on January 20, 2002. Rather, on more than one occasion on January 20, Ms. Hooper was instructed to return the original citations to headquarters and/or not issue the citations. Ms. Hooper refused to comply with that order four times. At no time, however, did Ms. Hooper inform her superiors that she had already delivered the original citations to a Durham police officer for submission to the magistrate's office. Nor did she ever tell her supervisors that she believed she needed a written order to void the citations, which unbeknownst to them, had already been delivered to the magistrate's office. In sum, Ms. Hooper disregarded NCCU policy not to charge students with criminal citations, refused to comply with a direct order four times, and concealed the fact that she had already submitted the criminal citations to the Durham magistrate's office.

Ms. Hooper has not presented sufficient evidence to demonstrate that her termination on the grounds of insubordination was a pretext for discrimination. The defendants' Motions for Summary Judgment on the retaliation claim pursuant to Title VII are GRANTED, and the Title VII claim is DISMISSED.

V.

Ms. Hooper also seeks relief pursuant to Title IX, which prohibits sex discrimination against students and employees of educational institutions that receive federal funds, providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

36

subjected to discrimination under any education program or activity receiving Federal funds." 20 U.S.C. § 1681(a). This statute carries an implied private right of action, Cannon v. Univ. of Chicago, 441 U.S. 677 (1979), and the Fourth Circuit has held that the implied right of action for enforcement of Title IX extends to "employment discrimination[7] on the basis of gender by education institutions receiving federal funds." Preston v. New River Comm. College, 31 F.3d 203, 206 (4th Cir. 1994) (citing North Haven Bd. of Educ. v. Bell, 456 U.S. 512 (1982)).

In Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, (1998), the Supreme Court set out the factors that a plaintiff alleging sexual harassment by a school employee would have to show before the school[8] could be liable under Title IX: (1) the plaintiff was subjected to *quid pro quo* sexual harassment or a sexually hostile environment; (2) the plaintiff provided actual notice of the situation to an

_____

[7]It is unclear from the record whether Ms. Hooper is also asserting a retaliation claim under Title IX. Although the Second Amended Complaint does not include a Title IX retaliation claim, Ms. Hooper's Memorandum of Law in Response to NCCU's Motion for Summary Judgment indicates that retaliation claims may be asserted under Title IX. The Fourth Circuit has not specified the elements required to establish a retaliation claim under Title IX, however, the Fourth Circuit has stated that Title VII jurisprudence "provide[s] a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX." Preston, 31 F.3d at 207. Therefore, because Ms. Hooper did not state a retaliation claim under Title VII, a claim for retaliation under Title IX must also fail.

[8]Because Title IX was enacted pursuant to Congress' spending power, only the institution that actually receives federal funding can be liable for violations of Title IX. Jennings v. Univ. of North Carolina, --- F.3d ---, 2006 WL 1578962, at *10 n.9 (4th Cir. June 8, 2006) ("Because school officials are not funding recipients under Title IX, school officials may not be sued in their individual capacities under Title IX.").

official of the educational institution with authority "to address the alleged discrimination and to institute corrective measures"; and (3) the institution's response to the harassment was so inadequate that it amounted to "deliberate indifference." Id. at 290.

The Fourth Circuit in Preston also held that principles governing Title VII actions provide standards for discrimination actions brought under Title IX. Preston, 31 F.3d at 207; see also Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-51 (1999) (relying on Title VII decisions to establish that "sexual harassment can constitute discrimination on the basis of sex under Title IX"). Thus, as with a Title VII claim, in order to be actionable under Title IX, the sexual harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. at 650.

As discussed above, Ms. Hooper has failed to establish that the defendants' conduct was sufficiently severe and pervasive to support a hostile environment claim under Title VII. Because Ms. Hooper cannot establish the first element of a Title IX claim, the defendants' Motions for Summary Judgment are GRANTED, and the Title IX claims are DISMISSED.

VI.

Ms. Hooper has also asserted a claim against the individual defendants pursuant to 42 U.S.C. § 1983. The Supreme Court has held that "to establish

38

*personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucy v. Graham, 473 U.S. 159, 166 (1985). The Fourth Circuit has held that intentional sexual harassment of a public employee by a supervisor constitutes gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and is actionable under § 1983. See Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir.1994). Thus, if Ms. Hooper can establish that she was discriminated against on the basis of gender, she may be able to sustain a § 1983 claim against the individual defendants.

As discussed in detail above, however, Ms. Hooper has not presented sufficient evidence to sustain a claim for gender discrimination. Because she cannot establish the deprivation of a federal right,[9] she cannot sustain a § 1983 claim against the individual defendants. Therefore, the defendants' Motions for Summary Judgment as to the § 1983 claim in the Second Amended Complaint are GRANTED, and the § 1983 claims are DISMISSED.

## VII.

Ms. Hooper has also alleged violations of 42 U.S.C. § 1985(2) and § 1985(3). Conspiracy to obstruct justice under 42 U.S.C. § 1985(2) occurs when "[t]wo or more persons conspire to injure [a] party or witness in [her] person or

---

[9]Ms. Hooper cannot pursue a § 1983 claim for violation of the Due Process Clause of the Fourteenth Amendment because the Court has previously held that Ms. Hooper did not have a protected property interest in continued employment by the NCCU Campus Police Department. [Doc. #33].

property" in retaliation for that person testifying in any court of the United States. 42 U.S.C. § 1985(2).

Similarly, Section 1985(3) creates a cause of action for victims injured by the overt acts of "two or more persons . . . [who] conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). The law is well settled that to establish a cause of action for conspiracy to deny civil rights under § 1985(3) a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. See Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir.1995).

An essential element of a claim under both sections 1985(2) and 1985(3) requires a plaintiff to establish that two or more persons conspired to deprive the plaintiff of her constitutional rights. To prove a "conspiracy of two or more persons," the plaintiff must produce evidence demonstrating an agreement, or a "meeting of the minds," between the defendants to violate the plaintiff's Constitutional rights. See id. at 1377. The Fourth Circuit has noted that "the law is well settled that merely conclusory allegations of conspiracy, unsupported by a factual showing of participation in a joint plan of action, are insufficient to support a

40

section 1985(3) action against a motion for summary judgment."  Id. at 1376.

In this case, Ms. Hooper makes conclusory allegations that the defendants conspired to deprive her of Constitutionally protected rights.   However, she simply has not offered any concrete facts to show that there was an agreement or a meeting of the minds between any of the defendants to violate her constitutional rights.  Therefore, Ms. Hooper cannot state a claim for violations of 42 U.S.C. § 1985.  The defendants' Motions for Summary Judgment on the § 1985 claims are GRANTED, and those claims are DISMISSED.

VIII.

Finally, Ms. Hooper has alleged numerous state constitutional, statutory, and common law violations.  Each of the federal claims in the case have been disposed of either through summary judgment or dismissal, and the Court declines to exercise jurisdiction over Ms. Hooper's state law claims.  28 U.S.C. § 1367(c)(3). Therefore, the remaining claims in the Second Amended Complaint are DISMISSED.

VIII.

For the foregoing reasons, NCCU's Motion for Summary Judgment [Doc. #77] is GRANTED as to the federal claims; Chancellor Ammons' Motion for Summary Judgment [Doc. #76] is GRANTED as to the federal claims; Chief Vick's Motion for Summary Judgment [Doc. #77] is GRANTED as to the federal claims; Captain Ingram's Motion for Summary Judgment [Doc. #72] is GRANTED as to the federal claims; and Lieutenant Watlington's Motion for Summary Judgment [Doc.

41

#74] is GRANTED as to the federal claims.  The state law claims of the Second

Amended Complaint are DISMISSED because the Court declines to exercise

supplemental jurisdiction.

This the day of October 3, 2006

___/s/ N. Carlton Tilley, Jr.___
United States District Judge